## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **KIM SHELTON, individually and as surviving spouse of JERRY SHELTON, Deceased; MICHAEL SHELTON and MELISSA MILLION,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES OF AMERICA,**<br><br>**Defendants.** | **Case No. 18-cv-00256-JFH** |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### Statement of the Case

On July 28, 2015, Jerry Shelton ("Mr. Shelton") presented to the Jack C. Montgomery VA Medical Center ("VAMC") emergency department in Muskogee, Oklahoma due to ongoing left flank pain. Jillian Riggs, D.O., one of two physicians on duty that evening, ordered a CT scan of Mr. Shelton's abdomen based on a suspicion of kidney stones. The radiology film from Mr. Shelton's CT scan was electronically sent to National Teleradiology for interpretation. The radiology film was read by Taylor MacDonald, M.D. ("Dr. MacDonald"). Dr. MacDonald reported kidney stones and a liver lesion. Dr. MacDonald noted "[f]urther evaluation with ultrasound or potentially multiphasic contrast-enhanced CT or MRI is recommended on a nonemergent basis." Dr. MacDonald's report also listed the diagnostic code "POSSIBLE MALIGNANCY." Mr. Shelton was discharged without ever being informed of the liver lesion. He was subsequently seen at the VAMC for various medical conditions, and no one advised him of the liver lesion until April 23, 2017. On April 23, 2017, a CT scan was performed at VAMC and Mr. Shelton was diagnosed with a liver lesion and possible metastatic lesions to the liver. Mr.

Shelton was ultimately diagnosed with Stage IV hepatocellular carcinoma.  On August 16, 2017, Mr. Shelton died as a result of liver cancer.

Kim Shelton, individually and as surviving spouse of Jerry Shelton, Michael Shelton and Melissa Million filed suit alleging wrongful death due to medical negligence.  This Court held a bench trial in this matter on February 2, 2021.  Upon due consideration and review of the evidence, the Court makes its findings of facts and conclusions of law as stated below.

## Stipulations

1.      The Court has jurisdiction of the case and all claims made.  Dkt. No. 114 at § IV(A), ¶ 1.

## Findings of Fact

1.      On July 28, 2015, Mr. Shelton, a 67 year old former Army Ranger and decorated Vietnam Veteran, presented to the VAMC emergency department due to ongoing left flank pain. Dkt. No. 114 at § IV(A), ¶¶ 3-4.

2.      Duncan McRae, M.D. ("Dr. McRae") and Jillian Riggs, D.O. ("Dr. Riggs") were the only physicians on duty in the ER at the VAMC from 4:00 p.m. on July 28, 2015, until 8:00 a.m. on July 29, 2015.  *Id.* at ¶ 5.

3.      Dr. Riggs, working as an independent contractor for the VAMC, ordered a CT scan of Mr. Shelton's abdomen based on a suspicion of kidney stone.  Dr. McRae, working as an independent contractor for the VAMC and the only other physician in the ER that evening, was also caring for Mr. Shelton.  *Id.* at ¶ 6.

4.      In the evenings when there are no in-house radiologists on site at the VAMC, radiology films are sent out electronically to National Teleradiology for interpretation.  *Id.* at ¶ 7.

5.      The CT ordered by Dr. Riggs of Mr. Shelton's abdomen based on a suspicion of kidney stone was performed and read by the radiologist, Taylor MacDonald, M.D. ("Dr. MacDonald"), who was located outside the State of Oklahoma.  *Id.* at ¶ 8.

6.      Dr. MacDonald's report noted kidney stones and a liver lesion.  It stated in pertinent part:

> There is a 19 mm hypodensity present along the right lobe of liver (coronal image 68). This is too dense to categorize as a simple cyst and was not definitively identified on the prior examination. Further evaluation with ultrasound or potentially multiphasic contrast-enhanced CT or MRI is recommended on a nonemergent basis.

*Id.* at ¶ 9.

7.      Dr. MacDonald recommended additional testing a second time in his report.  He stated:

> 19 mm lesion within the right lobe liver, not completely characterized on today's examination. Further evaluation with ultrasound or potentially multiphasic contrast-enhanced CT or MRI is recommended on a nonemergent basis.

*Id.* at ¶ 10.

8.      Dr. MacDonald's radiology report noted both kidney stones and a liver lesion, and listed the diagnostic code as "POSSIBLE MALIGNANCY".  *Id.* at ¶ 11.

9.      The VAMC tracking log shows that Mr. Shelton arrived in Radiology at 11:29 p.m. on July 28th, a CT scan was performed at 11:59 p.m. on July 28th, the scan was received by National Teleradiology on July 29th at 12:03 a.m., and it was read and entered into Mr. Shelton's VA medical records on July 29th at 12:35 a.m. *Id.* at ¶ 12.

10.     Beginning at 12:35 a.m. on July 29, 2015, Dr. McRae and Dr. Riggs both had access to Dr. MacDonald's interpreting report from Mr. Shelton's CT scan.  *Id.* at ¶ 13.

11.     Dr. McRae, Mr. Shelton's treating ER physician, did not open and read the report reflecting "POSSIBLE MALIGNANCY" even though it was available to him.  *Id.* at ¶ 14.

12.     The CT scan report was an abnormal test result.  Dr. Duncan McRae Trial Transcript ("McRae Transcript"), 127:3-5.

13.     An adverse result alert is not sent to the patient's team, the nurse, or others in the VAMC ER; rather, the alert is provided solely to the ordering physician.  Dkt. No. 114 at § IV(A), ¶ 15.

14.     Dr. McRae alleged in his deposition that the radiologist may have called the ER with the findings on the CT scan and given the report to the nurse.  *Id.* at ¶ 16.

15.     The radiology report and the medical records reflect no call was made to the VAMC by the third-party radiologist regarding the finding of Mr. Shelton's possible malignancy.  *Id.* at ¶ 17.

16.     Kathleen Schunemann, RN ("Nurse Schunemann"), cared for Mr. Shelton in the Emergency Room on July 28th and 29th, 2015.  *Id.* at ¶ 18.

17.     Nurse Schunemann did not talk with radiologists about radiology reports because such information was not provided to nurses.  *Id.* at ¶ 19.

18.     Nurse Schunemann, as a VAMC nurse, never provided results of critical results or abnormal results to the patient because that was the physicians' job.  *Id.* at ¶ 20.

19.     In this case, Nurse Schunemann did not take a call from the radiologist regarding any findings and report to Dr. McRae.  *Id.* at ¶ 21.

20.     While Nurse Schunemann would have had access to Mr. Shelton's CT report, and she may have taken note of it, Dr. McRae was responsible for opening up the CT report and reporting the results to the patient.  *Id.* at ¶ 22.

21.     Nurse Schunemann would not have opened up Mr. Shelton's CT report or given the results to Dr. McRae.  *Id.* at ¶ 23.

22.     Because the report was available to Dr. McRae in the chart, he should have discussed its findings with Mr. Shelton.  *Id.* at ¶ 24.

23.     In addition to practicing in emergency medicine, Dr. McRae also practiced as an oncologist for many years.  *Id.* at ¶ 34.

24.     Neither Dr. McRae nor Dr. Riggs discussed the liver lesion finding with Mr. Shelton or his family.  *Id.* at ¶ 33.

25.     None of the liver testing recommended by Dr. MacDonald was performed or even scheduled.  *Id.* at ¶ 35.

26.     Mr. Shelton was discharged July 29, 2015, from the emergency department with a prescription for hydrocodone to ease his pain in passing the kidney stones.  *Id.* at ¶ 36.

27.     Accepted standards of medical care required the VAMC to further evaluate the hypodensity along the right lobe of Mr. Shelton's liver noted by Mr. MacDonald on the CT scan performed July 28, 2015 by performing an ultrasound, multiphasic contrast-enhanced CT or MRI. *Id.* at ¶ 28.

28.     VAMC has a policy effective October 7, 2015, which stated:

It is VHA policy that all test results must be communicated by the diagnostic provider to the ordering provider, or designee, within a time-frame that allows for prompt attention and appropriate action to be taken. All test results requiring action must be communicated by the ordering provider, or designee, to patients no later than 7 calendar days from the date on which the results are available. For test results that require no action, results must be communicated by the ordering provider, or designee, to patients no later than 14 calendar days from the date on which the results are available.  Depending on the clinical context, certain test results may require review and communication in shorter time-frames (see definitions paragraph related to abnormal and normal results).  All VA medical facilities are expected to put into place appropriate systems and processes to ensure timeliness of appropriate communication and follow-up of test results.

*Id.* at ¶ 29.

29. VAMC had a policy effective beginning March 24, 2009, contained in VHA Directive 2009-019 which states in pertinent part:

> Timely communication of diagnostic test results to patients is important to the provision of quality care. Communication of test results to patients facilitates their involvement in care. Lack of timely follow-up of abnormal test results has been identified as a contributor to poor outcomes and has been a major cause of malpractice suits for VHA. Communication of results to patients contributes to safe care by ensuring timely review of all results by clinicians, as well as patient awareness of significant abnormal results that may require follow-up. Unnecessary repetition of diagnostic testing contributes to health care costs. When patients are aware of what testing was done and the results, the probability that patients will receive appropriate follow-up is increased and the likelihood of repetitive, duplicative testing is decreased. Finally, a lack of knowledge about test results can be a source of considerable anxiety to patients and families. Timely communication of results demonstrates respect and concern for patients' well-being.

*Id.* at ¶ 30.

30. There was a lack of timely follow-up of Mr. Shelton's abnormal test results in this case. *Id.* at ¶ 31.

31. VAMC had a policy effective beginning March 24, 2009, contained in VHA Directive 2009-019 which states in pertinent part:

> Results are communicated to patients no later than 14 calendar days from the date on which the results are available to the ordering practitioner. Significant abnormalities may require review and communication in shorter timeframes and 14-days represents the outer acceptable limit. For abnormalities that require immediate attention, the 14-day limit is irrelevant, as the communication should occur in the timeframe that minimizes risk to the patient. NOTE: Separate VHA policies may set standards regarding communication of results for specific tests. When separate VHA policies exist that set standards for communication of specific test results, the shorter standard (of the separate policy or the 14-day standard of this policy) takes precedence.

*Id.* at ¶ 32.

32. Plaintiffs' expert, Dr. Villa testified Mr. Shelton's liver lesion would have been clinically staged as a T1a hepatoma. Luis Villa Trial Transcript ("Villa Transcript"), 8:12-15.

33.     Mr. Shelton's CT scan showed no evidence of other anatomic abnormalities of the liver, showed no evidence of a large spleen and no evidence of ascites.  *Id.* at 8:16-20.

34.     In 2015, Mr. Shelton's liver function tests were normal.  *Id.* at 8:21-22.

35.     Dr. Villa testified Mr. Shelton's T1a tumor could have been treated with a surgical resection of the tumor and would have had a 60-70% chance of being completely cured.  *Id.* at 10:25-11:6.

36.     Following his discharge, Mr. Shelton was seen at VAMC numerous times over a span of nearly two years.  Dkt. No. 114 at § IV(A), ¶ 37.

37.     On August 26, 2015, Mr. Shelton was seen at VAMC for ingrown toenails, left knee pain and kidney stones.  No one advised him of his abnormal CT report, although it was available, nor were any attempts made to further evaluate it.  *Id.* at ¶ 38.

38.     On September 28, 2015, Mr. Shelton was seen at VAMC for a urology consultation.  *Id.* at ¶ 39.

39.     The urology consultation on September 28, 2015, was the follow-up visit from the emergency department visit on July 28, 2015.  Despite the fact Mr. Shelton was experiencing pain from the kidney stones and was supposed to have been seen by the urology department within 24 hours of being discharged on July 28 2015, it took nearly two months for him to be seen by a VAMC urologist, Stone Hallquist, M.D ("Dr. Hallquist").  *Id.* at ¶ 40.

40.     Following Mr. Shelton's visit, Dr. Hallquist dictated a consult note which acknowledged the CT scan and recited pertinent portions of the scan report relating to the kidney stone.  Dr. Hallquist then dictated:  "No other abnormalities were noted."  *Joint Trial Exhibit* 1 at 294.

41.     Dr. Hallquist's statement that "no other abnormalities were noted" was incorrect. Dr. Michael O'Leary Trial Transcript ("O'Leary Transcript"), 18:12-19.

42.     It was inappropriate for Dr. Hallquist to look at the first part of the CT scan and not look at the second part dealing with the liver lesion.  McRae Transcript, 115:1-3.

43.     Dr. Hallquist did not advise Mr. Shelton of the existence of the liver lesion on September 28, 2015.  No. 114 at § IV(A), ¶ 39.

44.     On November 30, 2015, Mr. Shelton was seen again by Dr. Hallquist at the VAMC. Dr. Hallquist did not advise Mr. Shelton of his abnormal CT report, nor were any attempts made to further evaluate it.  *Id.* at ¶ 42.

45.     Plaintiffs' expert, Dr. O'Leary opined Dr. Hallquist acted below the standard of care by failing to advise Mr. Shelton of the abnormal CT scan.  O'Leary Transcript, 19:5-11.

46.     Dr. O'Leary also testified Dr. Hallquist acted below the standard of care by failing to take any action, including follow-up testing, regarding the abnormal CT scan conducted on July 28, 2015.  *Id.* at 14:3-15:2.

47.     On October 6, 2015, Mr. Shelton was seen at VAMC for left knee pain.  No one advised him of his abnormal CT report, nor were any attempts made to further evaluate it.  Dkt. No. 114 at § IV(A), ¶ 41.

48.     On April 15, 2016, Mr. Shelton was seen at the VAMC for tremors.  No one advised him of his abnormal CT report, nor were any attempts made to further evaluate it.  *Id.* at ¶ 43.

49.     On May 16, 2016, Mr. Shelton was seen at the VAMC for an optometry visit.  No one advised him of his abnormal CT report, nor were any attempts made to further evaluate it.  *Id.* at ¶ 44.

50.     On May 25, 2016, Mr. Shelton was seen at the VAMC for a follow-up visit for PTSD.  No one advised him of his abnormal CT report, nor were any attempts made to further evaluate it.  *Id.* at ¶ 45.

51.     On June 2, 2016, Mr. Shelton was seen at the VAMC for diarrhea.  No one advised him of his abnormal CT report, nor were any attempts made to further evaluate it.  *Id.* at ¶ 46.

52.     On June 13, 2016, Mr. Shelton was seen at the VAMC for an ENT consultation.  No one advised him of his abnormal CT report, nor were any attempts made to further evaluate it.  *Id.* at ¶ 47.

53.     On July 21, 2016, Mr. Shelton was seen at the VAMC for a pre-op check and x-ray.  No one advised him of his abnormal CT report, nor were any attempts made to further evaluate it.  *Id.* at ¶ 48.

54.     On July 27, 2016, Mr. Shelton was seen at the VAMC for sleep apnea.  No one advised him of his abnormal CT report, nor were any attempts made to further evaluate it.  *Id.* at ¶ 49.

55.     On July 28, 2016, Mr. Shelton was seen at the VAMC for a pre-op ENT consultation.  No one advised him of his abnormal CT report, nor were any attempts made to further evaluate it.  *Id.* at ¶ 50.

56.     On July 29, 2016, Mr. Shelton was seen at the VAMC for septoplasty.  No one advised him of his abnormal CT report, nor were any attempts made to further evaluate it.  *Id.* at ¶ 51.

57.     On August 18, 2016, Mr. Shelton was seen at the VAMC for a post-op visit.  No one advised him of his abnormal CT report, nor were any attempts made to further evaluate it.  *Id.* at ¶ 52.

58.     On September 22, 2016, Mr. Shelton was seen at the VAMC for another post-op visit.  No one advised him of his abnormal CT report, nor were any attempts made to further evaluate it.  *Id.* at ¶ 53.

59.     On December 16, 2016, Mr. Shelton was seen at the VAMC for a mental health visit.  No one advised him of his abnormal CT report, nor were any attempts made to further evaluate it.  *Id.* at ¶ 54.

60.     On February 21, 2017, Mr. Shelton was seen at the VAMC for back pain.  No one advised him of his abnormal CT report, nor were any attempts made to further evaluate it.  *Id.* at ¶ 55.

61.     On March 11, 2017, Mr. Shelton was seen at the VAMC for a primary care visit. No one advised him of his abnormal CT report, nor were any attempts made to further evaluate it. *Id.* at ¶ 56.

62.     From July 29, 2015 to April 23, 2017, Mr. Shelton was seen at the VAMC for dental work on the following dates:  October 16, 2015; November 10, 2015; December 16, 2015; December 22, 2015; January 21, 2016; February 16, 2016; March 22, 2016; April 21, 2016; July 22, 2016; and January 17, 2017.  At no time did anyone advise him of his abnormal CT report, nor were any attempts made to further evaluate it.  *Id.* at ¶ 57.

63.     From July 29, 2015 to March 31, 2017, Mr. Shelton was seen at the VAMC for International Normalized Ratio blood testing to check Mr. Shelton's blood clotting factors:  August 17, 2015; September 28, 2015; November 9, 2015; December 18, 2015; January 29, 2016; March 4, 2016; March 22, 2016; April 15, 2016; April 29, 2016; May 16, 2016; June 13, 2016; July 11, 2016; August 5, 2016; September 2, 2016; September 16, 2016; October 24, 2016; November 7, 2016; December 15, 2016; February 3, 2017; March 3, 2017; and March 31, 2017.  At no time did

anyone advise him of his abnormal CT report, nor were any attempts made to further evaluate it. *Id.* at ¶ 58.

64.     On April 23, 2017, a CT scan was performed at the VAMC and Mr. Shelton was diagnosed with a liver lesion and possible metastatic lesions to the lung. *Id.* at ¶ 59.

65.     On May 5, 2017, a CT-guided liver biopsy was performed on Mr. Shelton at St. John Medical Center. *Id.* at ¶ 60.

66.     On May 9, 2017, the pathologist, Kanwaljit Aulakh, M.D., authored a report that contained the following diagnosis as a result the May 5, 2017 biopsy:

> Liver, mass, biopsy.  Well differentiated hepatocellular carcinoma, pseudo acinar and steatohepatitis variant.

*Id.* at ¶ 61.

67.     On June 6, 2017, Mr. Shelton was seen at Oklahoma Cancer Specialists and Research Institute where he saw Charles Taylor, M.D. ("Dr. Taylor"). *Id.* at ¶ 62.

68.     Dr. Taylor diagnosed Mr. Shelton with Stage IV hepatocellular carcinoma. *Id.* at ¶ 63.

69.     On August 7, 2017, Mr. Shelton was told by Dr. Taylor that his cancer was not treatable and hospice care was recommended. *Id.* at ¶ 64.

70.     On August 16, 2017, Mr. Shelton died as a result of liver cancer. *Id.* at ¶ 65.

71.     On September 6, 2017, Dr. Taylor certified on the State of Oklahoma Certificate of Death that Mr. Shelton died as a result of "well differentiated hepatocellular carcinoma." *Id.* ¶ 66.

72.     The hepatocellular cancer that caused Mr. Shelton's death was the same cancer demonstrated on the July 28, 2015 CT scan.  Villa Transcript, 15:18-16:1.

73.     On September 15, 2017, Mr. Shelton's widow, Kim, her children, and their spouses met with representatives of the VAMC, including the Risk Manager, Stacy Settlemyre; the Chief

of Quality, Safety, and Value Service, Jamie Brown; the Acting Chief of Staff, Nasreen Bukhari,

M.D. ("Dr. Bukhari"); and the Associate Director for Patient Care Services, Bonnie Pierce, R.N.

Dkt. No. 114 at § IV(A), ¶ 67.

74.    A written summary of that meeting was prepared and placed in Mr. Shelton's

record. *Id.* at ¶ 68.

75.    The *Institutional Disclosure of Adverse Event Form*, states in pertinent part:

Discussion points of the adverse event: Dr. Bukhari started the conversation by
apologizing for the family's loss.  She stated directly to the family that the care
provided by the VA did not meet our standards or their expectations and she was
very sorry that had occurred.  No one intentionally missed it, but the staff focused
on the kidney stone starting August 28, 2015 and neglected to notice the liver
lesion.  She acknowledged that the liver lesion was on the CAT scan at that time
but was not acted upon by the ED physician, urologist and multiple other physicians
that saw him.  The focus was only on the kidney stone.  The liver lesion was a
missed diagnosis until April 20, 2017, when another CAT scan was done which
showed that he had liver lesion with possible metastatic lesions to the lung.  This
turned out to be metatstatic [sic] liver cancer.  Our facility's failure to diagnose and
treat the liver lesion contributed to and hastened his death.

Offer of assistance, including arrangements for a second opinion, additional
monitoring, expediting clinical consultations, bereavement support:  Conversation
focused on filing tort paperwork and disability claim process.

Questions addressed in the discussion:  What is the date to use regarding when the
family learned that the facility made errors?  Staff told the family to use today's
date: 9/15/17.  Until this time the family had not been informed that the facility had
made an error.  Dr. Bukhari described the error as a missed diagnosis.

Advisement of 1151 claims process and right to file administrative tort claim: Stacy
Settlemyre presented the forms and instructions to the family.  She discussed the
process of filling out the forms to the family, giving written information as well.
She stated they could receive assistance at no cost from Phillip Cozzoni, Attorney
for VA, and the Veterans Benefits Office on Main Street in Muskogee.

Continued communication regarding the adverse event:  Dr. Pierce told the family
that the abnormal result policy has been reviewed to improve our processes to
prevent this type of mistake in the future. Jason Million stated that providers in
Primary Care on different teams are not documenting accurately, and there is
negativity present [sic] in Primary Care and Inpatient charting. Dr. Bukhari stated
she was not aware of this and would review the concerns.  Chris Shelton stated that

prostate issues were not addressed, were "put off" by the health care team. Additionally, he stated that staff tried to side-step treatment for his nose. Treatment for squamous cell carcinoma of the nose was only implemented after insistence by the family and after the lesion had noticeably progressed. Mr. Shelton stated that he was seen multiple times while this lesion was progressing and the health care team did Not address it until the family demanded treatment. Mr. Shelton and Mr. Million stated they were both veterans and would never be treated at this VA.

*Id.* at ¶69.

76.   Dr. Bukhari told the family that the "care provided by the VA did not meet our standards or their expectations." *Id.* at ¶ 70.

77.   She also stated, "Our facility's failure to diagnose and treat the liver lesion contributed to and hastened his death." *Id.* at ¶ 71.

78.   VAMC policies and procedures require the Institutional Disclosure of Adverse Event form is to be used as follows:

Institutional disclosure of adverse events (sometimes referred to as "administrative disclosure") is a formal process by which facility leader(s) together with clinicians and others, as appropriate, inform the patient or the patient's personal representative that an adverse event has occurred during the patient's care that resulted in, or is reasonably expected to result in, death or serious injury, and provide specific information about the patient's rights and recourse (see par. 8). NOTE: Facility leaders may also be involved in communicating information as part of a large-scale disclosure, but this is not considered an institutional disclosure.

*Id.* at ¶ 72.

79.   When an abnormal test result like Mr. Shelton's occurs, an alert in the VAMC computer system occurs. *Id.* at ¶ 73.

80.   The abnormal test result alert is transmitted to the physician who ordered the test. *Id.* at ¶ 74.

81.   The abnormal test result is also transmitted to the VAMC Quality Assurance Department. *Id.* at ¶ 75.

82.     Every week, the VAMC Quality Assurance Department receives a report listing all the abnormal test results at the VAMC for the preceding week.  *Id.* at ¶ 76.

83.     Mr. Shelton's abnormal CT scan result was sent to the Quality Assurance Department in this case.  *Id.* at ¶ 78.

84.     Within a week of Mr. Shelton's abnormal CT scan result, the VAMC Quality Assurance Department would have received a report listing Mr. Shelton's abnormal CT scan result. *Id.* at ¶ 77.

85.     Jerry Shelton was born on March 14, 1948.  *Id.* at ¶ 79.

86.     If Mr. Shelton had been diagnosed with hepatocellular cancer in August of 2015, he would have had a much higher chance of being treated for his hepatocellular cancer at the time. Dr. Nasreen Bukhari Trial Transcript, 32:20-22.

87.     Jerry and Kim Shelton were married on March 17, 1973.  Dkt. No. 114 at § IV(A), ¶ 80.

88.     Michael Shelton is the son of Jerry Shelton.  *Id.* at ¶ 82.

89.     Melissa Million is the daughter of Jerry Shelton.  *Id.* at ¶ 83.

90.     The funeral and burial expenses in this case are $8,325.00.  *Id.* at ¶ 85.

91.     As a result of his hepatocellular cancer, Jerry Shelton endured significant physical pain before his death.  Joint Trial Exhibits 2 and 3.

92.     Kim Shelton suffered loss of consortium and grief as a result of the death of Jerry Shelton.  Kim Shelton Trial Transcript ("K. Shelton Transcript"), 105:23-147:14; Melissa Million Trial Transcript ("Million Transcript"), 139:12-147:11; Michael Shelton Trial Transcript ("M. Shelton Transcript"), 147:20-157:1.

93.     Michael Shelton suffered grief and loss of companionship as a result of the death of Jerry Shelton.  K. Shelton Transcript, 105:23-147:14; Million Transcript, 139:12-147:11; M. Shelton Transcript, 147:20-157:1.

94.     Melissa Million suffered grief and loss of companionship as a result of the death of Jerry Shelton.  K. Shelton Transcript, 105:23-147:14; Million Transcript, 139:12-147:11; M. Shelton Transcript, 147:20-157:1.

95.     Dr. Hallquist was an employee of VAMC at the time he treated Mr. Shelton.  Dkt. No. 114 at § IV(A), ¶ 86.

96.     Vista Staffing Solutions, Inc.'s subsidiary, Vista Healthcare Partners, Inc., had a contractual relationship with the VAMC as a staffing agency to provide locum tenens physicians for open positions at the VAMC.  *Id.* at ¶ 87.

97.     In July of 2015, Dr. McRae worked at the VAMC through a service placement agreement with Vista Healthcare Partners.  *Id.* at ¶ 88.

98.     In July of 2015, Dr. Riggs worked at the VAMC through a service placement agreement with Vista Healthcare Partners.  *Id.* at ¶ 89.

99.     At all times relevant to their treatment of Mr. Shelton in July of 2015, both Dr. McRae and Dr. Riggs were independent contractors for the VAMC and not employees of the VAMC.  *Id.* at ¶ 90.

100.    On January 16, 2020, Dr. McRae, Dr. Riggs and Vista Staffing Solutions were dismissed from this lawsuit after reaching a settlement agreement with Plaintiffs.  *Id.* at ¶ 91.

## Conclusions of Law

1.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1346, 1367 and 2671.

2.      Under the Federal Tort Claims Act ("FTCA"), liability for medical malpractice is controlled by state law, in this case the state of Oklahoma.  *Flynn v. United States*, 902 F.2d 1524, 1527 (10th Cir. 1990).

3.      A plaintiff in a medical malpractice action must prove by a preponderance of the evidence that:  (1) there was a duty owed by the Defendant to Plaintiff, (2) there was a failure to perform that duty, and (3) that injuries to the Plaintiff were proximately caused by the Defendant's failure(s).  *Smith v. Hines*, 261 P.2d 1129, 1133 (Okla. 2011).

4.      The VAMC is a facility that falls under the scope of the FTCA.  28 U.S.C. § 2671.

5.      The standard of care in Oklahoma requires those engaging in the healing arts to be measured by the national standard.  *Grayson v. State*, 838 P.2d 546, 550 (Okla. App. 1992).

6.      "In treating a patient, a physician must use his or her best judgment and apply with ordinary care and diligence the knowledge and skills that is possessed and used by members of his or her profession in good standing engaged in the same field of practice at that time . . . .  A physician does not guarantee a cure and is not responsible for the lack of success, unless that lack results from his or her failure to exercise ordinary care or from his or her lack of that degree or knowledge and skill possessed by physicians in the same field of practice."  Oklahoma Uniform Jury Instructions Civil 3d 14.1.

7.      The Plaintiffs bear the burden or producing evidence tending to establish a causal link between the alleged negligence and the injury, and Plaintiffs also bear the burden of persuading the trier of fact by the greater weight of the evidence that Mr. Shelton's injury was in fact caused by the alleged negligence.  *McKellips v. Saint Francis Hosp. Inc.*, 741 P.2d 467, 471

(Okla. 1987).  The "greater weight of the evidence" is construed to mean "more probably true than not true or more likely so than not so."  *Id.*  "Absolute certainty is not required, however mere possibility or speculation is insufficient."  *Id.*  If the probabilities are evenly balanced or less, the Plaintiffs have failed to carry their burden.  *Id.*

8.       Proximate cause consists of cause in fact and legal causation.  The latter concerns a determination as to whether legal liability should be imposed as a matter of law where cause in fact is established.  Cause in fact deals with the "but for" consequences of an act.  *McKellips*, 741 P.2d at 470.

Dr. McRae and Dr. Riggs:

9.       The applicable standard of medical care required Dr. Riggs and/or Dr. McRae to timely review the CT scan report from Dr. MacDonald and inform Mr. Shelton's of the results of the CT scan.

10.      Dr. McRae and Dr. Riggs failed to meet the standard of care regarding reviewing Mr. Shelton's CT scan on July 29, 2015.

11.      Dr. McRae and Dr. Riggs deviated from the appropriate standard of medical care in failing to inform Mr. Shelton of the liver lesion revealed on his CT scan.

12.      Dr. McRae and Dr. Riggs further deviated from the appropriate standard of medical care in failing to refer Mr. Shelton for follow-up medical treatment after his CT scan revealed liver lesions.

13.      It was foreseeable that a delay in informing Mr. Shelton of the liver lesion and a delay in Mr. Shelton receiving treatment for his liver lesion would result in further deterioration, decreasing Mr. Shelton's odds of survival.

14.     The breach of the applicable standard of care by Dr. McRae and Dr. Riggs with regard to the failure to inform Mr. Shelton of the liver lesion and refer him for subsequent medical evaluation and treatment proximately caused injuries and ultimately the death of Mr. Shelton, resulting in damages to Mr. Shelton, his wife and children.

Dr. Hallquist:

15.     Dr. Hallquist was an employee, agent and servant of the VAMC at all times relevant to his care of Mr. Shelton, and covered at all times by the FTCA.

16.     The applicable standard of medical care required Dr. Hallquist to review Mr. Shelton's CT scan report when he treated Mr. Shelton on September 28 and November 30, 2015.

17.     The applicable standard of medical care required Dr. Hallquist to ensure Mr. Shelton was aware of the liver lesion and seeking appropriate medical care.

18.     The standard of medical care applicable to Mr. Hallquist treating Mr. Shelton after his July 2015 emergency room visit required Dr. Hallquist to ensure Mr. Shelton had received or was scheduled to receive the ultrasound or multiphasic contrast-enhanced CT or MRI recommended by Dr. MacDonald or refer Mr. Shelton to the appropriate medical care provider to obtain such attention.

19.     Dr. Hallquist failed to meet the standard of care regarding reviewing Mr. Shelton's medical records, informing Mr. Shelton of the lesion and ensuring Mr. Shelton was receiving appropriate medical treatment for the lesion.

20.     Dr. Hallquist deviated from the appropriate standard of care in failing to fully review Mr. Shelton's CT scan report, ensure Mr. Shelton was aware of the liver lesion and receiving appropriate medical treatment.

21.     It was foreseeable that a delay in informing Mr. Shelton of the liver lesion and a delay in Mr. Shelton receiving treatment for his liver lesion would result in further deterioration, decreasing Mr. Shelton's odds of survival.

22.     The breach of the applicable standard of care by Dr. Hallquist, with regard to the failure to inform Mr. Shelton of the liver lesion, diagnose and treat the liver lesion proximately caused injuries and ultimately the death of Mr. Shelton, resulting in damages to Mr. Shelton, his wife and children.

23.     The Plaintiffs, Kim Shelton, individually and as surviving spouse of Jerry Shelton, Michael Shelton and Melissa Shelton, have established by a preponderance of the evidence the necessary elements required to prevail in a claim for injuries due to medical negligence resulting in wrongful death.

24.     The damages recoverable in actions for wrongful death are governed by Oklahoma state law, Okla. Stat. tit. 12, § 1053.

25.     The Plaintiffs were damaged as follows:

a.  Burial and funeral expenses in the amount of $8,325.00, payable to Kim Shelton.

b.  For Mr. Shelton's pain and anguish, a total amount of $350,000.00, payable to Kim Shelton.

c.  For Kim Shelton's loss of consortium, a total amount of $1,150,000.00.

d.  For the grief and loss of companionship of Michael Shelton and Melissa Million, a total amount of $100,000.00, to be distributed equally to Michael Shelton and Melissa Million.

26.     Accordingly, the Court finds total damages proven by the Plaintiffs, Kim Shelton, individually and as surviving spouse of Jerry Shelton, Michael Shelton and Melissa Shelton, in the amount of $1,608,325.00.

27.     Pursuant to Okla. Stat. 23, § 15, "the liability for damages caused by two or more persons shall be several only and a joint tortfeasor shall be liable only for the amount of damages allocated to that tortfeasor."  The Court finds the following percentages of liability:

| | |
|---|---|
| Dr. McRae | 25% |
| Dr. Riggs | 25% |
| Dr. Hallquist (VAMC) | 50% |
| Total | 100% |

28.     The United States of America is therefore liable for the injuries and damages recoverable under Okla. Stat. tit. 12, § 1053 in the total amount of $804,162.50.

IT IS THEREFORE ORDERED that Judgment should be entered against Defendant United States of America and in favor of Plaintiffs Kim Shelton, individually and as surviving spouse of Jerry Shelton, Michael Shelton, and Melissa Million in the amount of $804,162.50 as set forth herein.

IT IS SO ORDERED this 16th day of September 2022.

_____
JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE